UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                                :
                                                      :        Chapter 11
BEST PAYPHONES, INC.,                                 :        Case No. 01-B-15472 (SMB)
                                                      :
                      Reorganized Debtor.   :
-------------------------------------------------------X

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A P P E A R A N C E S:**

DUANE MORRIS LLP
Attorneys for Manhattan Telecommunications
     Corporation d/b/a MetTel

380 Lexington Avenue
New York, New York 10168

     Fran M. Jacobs, Esq.
     Of Counsel


LAW OFFICE OF JOSEPH P. GARLAND
Attorneys for Best Payphones, Inc.
275 Madison Avenue, 4th Floor
New York, New York 10016

     Joseph P. Garland, Esq.
     Of Counsel


**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

      Manhattan Telecommunications Corporation d/b/a MetTel ("MetTel") filed a multi-

faceted proof of claim in this case that sought, among other things, damages in the form of lost

profits arising from the breach by the reorganized debtor ("Best") of a certain contract described

in detail below.  Best objected to the lost profits claim.  The Court conducted a three-day bench

trial on December 4, December 13 and December 14, 2006, and concludes that MetTel holds an

allowed claim for lost profits in the principal sum of $238,082.43, plus statutory interest accruing

through the petition date.

## BACKGROUND[1]

At all relevant times, MetTel operated as a competitive local exchange carrier ("CLEC"),

and provided various types of telephone service. (Tr. (12-4) at 16-17.) Best installed and

operated pay telephones in Manhattan, the Bronx, and Brooklyn. (Tr. (12-13) at 18-19.)

Michael Chaite is Best's president and sole shareholder. (Tr. (12-13) at 18.) A payphone

operator like Best must contract for dial tone service with a CLEC. The current dispute centers

on such a contract (the "Natelco Agreement") between Best and the North American

Telecommunications Corporation ("Natelco"), dated Dec. 8, 2000, (MX 11), which Natelco

assigned to MetTel.[2] The parties' history, however, predates the Natelco Agreement, and is

relevant to some of the issues before the Court.

Best started operating in 1987, (Chaite Deposition, at 5), and regularly changed dial tone

service providers, at least in the later years. On or about November 18, 1998, it entered into a

service contract with Natelco. (BX S.) Less than one year later, on September 24, 1999, it

entered into a service contract with MetTel (the "1999 Contract"). (MX 26.) The MetTel-Best

marriage was an unhappy one, and while its agreement with MetTel was still in effect, Best left

MetTel, returned to Natelco and signed the Natelco Agreement. MetTel eventually sued Best on

---

[1]        The following conventions are used in citing to the trial record. The daily transcript is cited by date and page. For example, "Tr. (12/4) at 10" refers to page 10 of the December 4, 2006 transcript. "MX" refers to MetTel's trial exhibits and "BX" refers to Best's trial exhibits. Finally, "Chaite Deposition" refers to the deposition testimony of Michael Chaite, held on several days beginning with June 13, 2006. The entire deposition transcript was received in evidence at the beginning of the trial. (See Tr. (12/4) at 11.)

[2]        Like MetTel, Natelco was a CLEC that also provided service to payphone customers. (Tr. (12-4) at 18-19.)

account of unpaid 1999 Contract charges in New York state court, and recovered two judgments in the approximate aggregate amount of $210,000. In re Best Payphones, Inc., No. 01-15472, 2002 WL 31767796, at *4 (Bankr. S.D.N.Y. Dec. 11, 2002). The judgments did not pertain to the Natelco Agreement.

## A.    The Natelco Agreement

Best signed the Natelco Agreement on December 8, 2000. Under the Agreement, Natelco was obligated to provide local and regional telecommunications services to each of the 964 payphones listed on Schedule A.[3] (See MX 11, at 1.) The initial term of the Natelco Agreement commenced on December 8, 2000, and remained in effect through the end of the twelfth calendar month after all of the payphones listed on Schedule A were provisioned with service. (Id., at ¶ 2; Tr. (12-13) at 119.) The one-year term began to run on January 31, 2001, (Tr. (12-4) at 63), and expired on January 31, 2002. Best could terminate the Natelco Agreement in the event of a material breach by Natelco, "unless NATELCO cures such breach within (10) business days after the date written Notice is given to NATELCO." (MX 11, at ¶ 7.) Finally, New York law governed the Natelco Agreement. (Id., at ¶ 19.)

## B    The Natelco Bankruptcy

On February 23, 2001, Natelco filed a petition for relief under chapter 11 of the Bankruptcy Code. (MX 4, at ¶ 4.) Natelco subsequently put its assets, including its customer service agreements, up for sale. (Tr. (12-4) at 18.) MetTel made a $3 million bid based, at least

---

[3]    Schedule A was never modified. (Tr. (12-13) at 121.)

in part, on the expected revenue from Natelco's 11,500 payphone lines over the remaining term

of its payphone customer contracts. (Tr. (12-4) at 20, 22.) The proposed sale to MetTel also

included Natelco's accounts receivable. (MX 3, at ¶ I.1(3).) MetTel and Natelco reached an

agreement, and entered into an Asset Purchase Agreement on April 4, 2001. (MX 3.) The Asset

Purchase Agreement was subject to approval by the Natelco bankruptcy court. (Id., at ¶ IV.4.)

The payphone customer contracts were treated as executory contracts under Section 365(a) of the

Bankruptcy Code and Bankruptcy Rule 6006(c), and all of the payphone customers, including

Best, received notice of the proposed sale to MetTel. (See MX 8, at 8 (# 66).)

Best filed an objection to the proposed sale. It did "not object to the concept of the

assignment of its contract," (MX 14, at ¶ 6), and did not contend that the Natelco Contract could

not be assigned without its consent. To the contrary, Best acknowledged that the Natelco

Agreement was an executory contract under § 365 of the Bankruptcy Code, (id., ¶ 5), and that

"executory contracts should be freely assignable to enhance the benefits to the estate an aid in the

reorganization of debtors." (Id. at ¶ 7.) Instead, it objected to MetTel, and had "serious doubts"

that MetTel would be able to provide prompt and efficient service in a fair and equal manner to

all customers. (Id. at ¶ 12.) Best explained its prior dissatisfaction with MetTel, and its

"legitimate concerns over the adequacy of the assurances of future performance." (Id.) Best also

recounted the pending litigation with MetTel over their 1999 Contract, and expressed a concern

that Best would attempt to terminate future service based on the non-payment of 1999 Contract

bills. (Id. at ¶ 13.)

The bankruptcy court overruled the objection, and approved the transaction from the

bench on April 25, 2001. Given the emergency circumstances (Natelco was out of cash and

could not continue to operate), the court waived the 10-day automatic stay of its order, and

authorized MetTel to begin immediately to provide service to the former Natelco customers.

(MX 15, at 80.)  Best filed a notice of appeal from the bench order, but District Judge McKenna

dismissed the appeal on September 6, 2001, due to Best's failure to comply with FED. R. BANKR.

P. 8006 and 8009.  (MX 34, Ex. D.)

On May 16, 2001, the bankruptcy court entered a formal order (the "Sale Order")

approving the assumption of the Natelco Customer Contracts [4] and their assignment to MetTel.

(MX 32, at ¶¶ 14, 15.)

## C.    The Regulatory Approvals

### 1.    The Federal Communications Commission ("FCC")

While the Sale Order did not require regulatory approval as a condition to its

effectiveness, MetTel nevertheless committed itself to obtain any necessary regulatory approvals.

(MX 3, at ¶ IV.3.)  Verizon insisted on it, (MX 15, at 54-55), and although MetTel thought it

unnecessary, Natelco urged MetTel to file a petition with the FCC to avoid the delay that a

possible objection by Verizon might cause.  (Tr. (12-4) at 32-33.)

Verizon's concern centered on potential liability for "slamming," the practice of changing

a phone customer's carrier without the customer's prior authorization.  The FCC had adopted

regulations that imposed substantial penalties on the "slammer."  See 47 C.F.R. §§ 64.1100-1190

(2000).  Among other things, the FCC regulations required the new carrier to verify that the

customer authorized the switch before the switch occurred.

---

[4]       The "Customer Contracts" referred to "all contracts relating to the Payphone Access Lines," (MX 3, at ¶
I.1(2)), and included the Natelco Agreement.

To meet Verizon's concern, MetTel filed an emergency petition with the FCC on April 4, 2001 (the "FCC Petition"), seeking a limited waiver of the customer authorization and verification requirements.  The purpose of the limited waiver was to allow the migration of the Natelco customers to MetTel without their <u>prior</u> authorization or consent.  The FCC Petition proposed, instead, that MetTel (or Natelco) would send two notification letters to each customer, one before and one after the sale closing.  Among other things, the letters would advise the customer that it was free to change its carrier.  (MX 18, at 4.)  The FCC Petition stated, however, that the right to change carriers was "subject to the terms and conditions of any applicable service agreements."  (<u>Id.</u> at 5.)  The sample notification letters that were attached to the FCC Petition included a similar limitation.  (<u>Id.</u> at 13.)  They stated, in pertinent part, that the right to change carriers was "subject to the terms and conditions of any applicable agreements."  The FCC Petition also referred to the sample notification letters, and offered to revise them at the FCC's request.  (<u>Id.</u> at 4 n.6.)  The FCC approved the petition and did not request any changes. (<u>See</u> Tr. (12-4), at 41.)

The FCC approved the limited waiver, by order dated April 11, 2001 (the "FCC Order"). (MX 19)(<u>reported at</u> 16 F.C.C.R. 7923).  The FCC found that the limited waiver was "necessary to provide a seamless transition with no disruption of service to the transferred customers."  (MX 19, at ¶ 6.)  Citing to the sample notification letters attached to the petition, as well as MetTel's commitment to investigate, respond to and attempt to cure any outstanding complaints, the FCC concluded that the MetTel conditions "will adequately protect the rights of the NATELCO customers."  (<u>Id.</u> at ¶ 8.)

After the bankruptcy court approved the transaction from the bench, MetTel sent the notices to Natelco's customers in accordance with the FCC Order.  At the direction of Andoni

Economou, MetTel's current Chief Operating Officer, and in 2001, its Executive Vice President, (see Tr. (12-4) at 15), the first notification letter was sent immediately, (id., at 42), and the second notification letter was sent with MetTel's initial bill, dated April 1, 2001.  (Id. at 45.)

### 2.    The New York Public Service Commission ("NYPSC")

On or about May 14, 2001, MetTel and Natelco also filed a joint petition with the NYPSC (the "NYPSC Petition"), the state agency that regulates intrastate telecommunications service.  (Tr. (12-4) at 46; MX 20.)  The migrations had already begun, and MetTel sought nunc pro tunc approval of the petition.  (MX 20, at 8.)  The NYPSC Petition was similar to the emergency petition submitted to the FCC.  It described the steps MetTel and Natelco were taking to notify Natelco customers about the transfer of services from Natelco to MetTel, including the transmission of two notification letters "advis[ing] them that they are free to change their local, regional and long distance preferred carrier, subject to the terms and conditions of any applicable service agreement."  (Id. at 5) (emphasis added.)  In addition, Natelco proposed to send a notice to its customers advising them that "once your account is transferred to MetTel and subject to any applicable agreements, you are free to make arrangements to change your service to another carrier."  (Id. at 6, 13) (emphasis added.)

The petition was granted, but on a prospective basis only, because "a timely petition would have been approved as consistent with the public interest."  (MX 21, at 5.)  The NYPSC also approved Natelco's proposed notices, and the notification procedures previously approved in the FCC Order pursuant to which MetTel was advising customers "that they may select a different preferred carrier, subject to the terms and conditions of any applicable service agreements."  (Id. at 4.)

D.      **The Best-MetTel Divorce**

The shotgun wedding between MetTel and Best did not last long.  On May 8, 2001,

MetTel sent Best a "Notice of Disconnection."  It stated that Best owed MetTel a total of

$267,328.61, based on three debts:  an unpaid judgment in the sum of $185,205.68 that related to

the 1999 Contract and had nothing to do with Natelco, an unpaid Natelco invoice, dated March

1, 2001, in the amount of $41,703.01, and the unpaid Natelco invoice, dated April 1, 2001, in the

amount of $40,419.92, that MetTel had just sent.  (MX 23.)  According to the Notice, MetTel

would suspend Best's service if Best did not pay $267,328.61 by May 18, 2001, and disconnect

the service 10 days later.  The Notice concluded, "[i]f you have any questions about your bill

please call me."

Best did not contact MetTel.  Instead, it entered into a service agreement with Bridgecom

Co. on May 15, 2001, and effected the migration of its lines away from MetTel.  At this time,

more than eight months still remained on the initial term of the Natelco Agreement.  On August

15, 2001, MetTel sued Best in state court for breach of the Natelco Agreement.[5]  The fourth

cause of action asserted a claim for unliquidated damages, and paragraph 29 of the complaint

referred to the unliquidated claim for lost profits caused by Best's breach of the Natelco

Agreement.  The action was automatically stayed when Best filed its chapter 11 petition in this

Court on October 23, 2001.

E.      **The Bankruptcy Proceedings**

After the chapter 11 was commenced, MetTel filed an amended proof of claim, dated

February 11, 2002.  (MX 1.)  The claim sought $406,157, plus an unliquidated amount.  The

---

[5]      A copy of the complaint is attached to MetTel's proof of claim.  (See MX 1.)

claim attached the state court complaint against Natelco. Best objected to the MetTel claim, and

on September 9, 2002, MetTel filed opposition to the objection. The opposition included a

declaration from David Aronow, MetTel's co-president. Aronow stated, among other things,

that Best's breach of the Natelco Agreement had caused lost profits of $84,000, "based on

MetTel's historical experience." (BX Z1, at ¶ 16.) The Court converted MetTel's objection to a

motion for summary judgment, and denied partial summary judgment on the lost profits claim.

Best Payphones, Inc., 2002 WL 31767796, at * 10.[6]

The timing of the claim objection coincided with the prosecution of the plan. Best and

Chaite jointly filed an initial plan on August 19, 2002, before the Aronow declaration, and at a

time when the MetTel claim was still unliquidated. It proposed to pay unsecured creditors,

which included MetTel, 100% of their allowed claims, in cash, on the effective date. (MX 43, at

5.) On September 9, 2002, the same day that MetTel filed the Aronow declaration, Best and

Chaite jointly filed an amended plan. Like the initial plan, the amended plan proposed to pay the

unsecured creditors in full. (MX 45, at 5.) Michael Chaite, Best's president, did not recall

whether he had seen the declaration before filing the amended plan. (Tr. (12-13) at 117.) The

Court confirmed Best's 100% plan in late December 2002, two weeks after it decided MetTel's

summary judgment motion.

---

[6]     That decision incorrectly stated that MetTel's proof of claim did not mention lost profits. As noted, the
claim was expressly mentioned in ¶ 29 of the state court complaint, and the state court complaint was attached to the
proof of claim.

**DISCUSSION**

**A.    Liability**

Under New York law, a party claiming a breach of contract must prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." Rexnord Holdings v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994); accord First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998). Here, MetTel sustained its burden of proving its claim. MetTel and Best were parties to the Natelco Agreement. Subject to the discussion of the Notice of Disconnection that follows below, MetTel provided dial-tone services in accordance with that contract. Best unilaterally terminated the contract in May 2001. And as discussed in detail later in this opinion, MetTel suffered lost profits as a result of the breach. Best has raised several defenses to liability, and it is to these that I now turn.

**1.    MetTel's Anticipatory Breach**

Best contends that MetTel committed an anticipatory breach when it sent the Notice of Disconnection, and this breach allowed it to terminate the Natelco Agreement. At the outset, MetTel was contractually entitled to send a "Notice of Disconnection" because Best was in default under the Natelco Agreement. It had failed to pay the March 1st and April 1st invoices, and owed $82,122.93. That account receivable was assigned to MetTel as part of the sale. MetTel could have demanded the payment of that sum, under threat of disconnection, without violating the parties' agreement.

MetTel nevertheless breached the Natelco Agreement because the Notice of Disconnection also insisted on the payment of the unrelated judgment debt. The Natelco Agreement limited the default remedies, including suspension and termination of services, to the failure "to pay invoiced amounts within the period provided herein." (MX 11, at ¶ 5.) The

default provisions plainly related to defaults under the Natelco Agreement, and not some other agreement.

MetTel's breach gave Best the right to terminate "unless [MetTel] cures such breach within ten (10) business days after the date written Notice is given to [MetTel]." (MX 11, at ¶ 7.) This condition to termination – notice and the opportunity to cure – applied to MetTel's anticipatory breach unless notice would have been futile. See Bausch & Lomb Inc. v. Bressler, 977 F.2d 720, 727-28 (2d Cir.1992). New York law strictly limits the "futility exception" to situations in which the breaching party expressly disavows any further duties or abandons performance. Point Prods. A.G. v. Sony Music Entm't, Inc., 93 Civ. 4001, 2000 WL 1006236, at *4 (S.D.N.Y. July 20, 2000). If the condition is not excused and the non-breaching party nonetheless terminates the contract, the termination is ineffective, Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 865 F.2d 513, 518-19 (2d Cir. 1989); SVS, Inc. v. Rabbit Ears Prods., Inc., No. 91 Civ. 6632, 1992 WL 91183, at *10 (S.D.N.Y. Dec. 12, 1991) ("Where the party asserting nonperformance does not give the defaulting party a chance to cure, the party asserting nonperformance cannot terminate the agreement"), and the termination is itself a breach. See Bausch & Lomb Inc. v. Bressler, 977 F.2d at 727.

Best undeniably failed to provide notice of the breach to MetTel, or the opportunity to cure it, and the evidence did not show that notice would have been futile. The Notice of Disconnection gave Best 10 days to pay, and invited Best to call if it had any questions. It also left open the prospect of continued service even after a disconnection. Best could have insisted that it was improper to require the payment of 1999 Contract judgment debt as a condition to continued service, and demanded the removal of that condition. In that event, however, MetTel

could have issued a new Notice of Disconnection, and demanded payment of $82,122.93 – the
amount past due under the Natelco Agreement.

There were two reasons why Best failed to give notice and an opportunity to cure.  First,
it did not want to do business with MetTel.  (_Corrected_ Proposed Findings of Fact and
Conclusions of Law of Debtor Best Payphones, Inc., dated Jan. 30, 2007, at p. 40[7])("Best's
Proposed Findings & Conclusions")(ECF Doc. # 639)("Best could not possibly have anticipated,
in signing the 2000 NATelCo Agreement, that it was committing itself to many months of
dealing with MetTel when the desire to get rid of MetTel was the motivating factor in coming
back to NATelCo.")  Second, it knew that if MetTel cured its breach and issued a new Notice of
Disconnection, Best would have to pay MetTel $82,122.93 as a condition to continued dial-tone
service.

Best now implies that it did not provide the notice and opportunity to cure because
MetTel could have suspended service before its cure period ran out.  (Best's Proposed Findings
& Conclusions, at ¶¶ 111-12.)  This assumes that MetTel had no intention of curing, and would
have rushed to suspend service after Best's 10-day payment period expired, but before its own
10-day cure period lapsed.  But MetTel could have also issued a new Notice of Disconnection
linked to the payment of $82,122.93.  (Tr. (12-4) at 59-60.)  Since MetTel was entitled to send a
Notice of Disconnection anyway, and could have cured its breach within the cure period, notice
was not futile.  See Filmline (Cross-Country Prods.), 865 F.2d at 519.  The fact that Best faced a
business risk if MetTel failed to cure more promptly then the time allotted under the contract

---

[7]     Best placed its proposed findings of fact in numbered paragraphs, but its proposed conclusions of law were
presented in memorandum form, which I authorized.  When citing to Best's Proposed Finding & Conclusions, the
use of the symbol "¶" indicates a reference to a proposed finding of fact, and the use of  "p." refers to the page
number of a proposed conclusion of law.

does not change the conclusion. See Bausch & Lomb, 977 F.2d at 727 (contractual notice and cure required despite the fact that aggrieved party was in critical selling season and could not wait out the full cure period).

Finally, Best's cases are distinguishable. The three decisions that applied New York law involved the waiver of the notice and cure requirement in the face of an unequivocal intention not to perform. See, e.g., Caisse Nationale de Credit Agricole v. CBI Indus., 90 F.3d 1264, 1975 (7th Cir. 1996)(breaching party "explicitly renounced the rights and duties" under the parties' contract); Concorde Fin. Corp. v. Value Line, Inc., No. 03 Civ. 8020, 2004 WL 1687205, at *4 (S.D.N.Y. July 28, 2004)(once a party "makes clear that it will not proceed with the contract," the other party does not have to perform obligations that may be futile or injurious, or "doggedly pursue" a contract that is no longer viable); Palazzetti Import/Export, Inc. v. Morson, No. 98 Civ. 722, 2001 WL 1568317, at *9 (S.D.N.Y Dec. 6, 2001)(notice excused where jury "concluded that Defendants had no intention of performing further under the License"). These cases reflect the application of the limited New York exception to the requirement to give notice and the opportunity to cure. The cases from other jurisdictions involve similar circumstances, and are consistent with New York law. See, e.g., Solitron Devices, Inc. v. Honeywell, Inc., 842 F.2d 274, 278-79 (11th Cir. 1988)(notice and cure waived where breaching party terminated the contract and repudiated all obligations); United States v. Digital Prods. Corp., 624 F.2d 690, 694 (5th Cir. 1980)(same); Howard Opera House Assocs. v. Urban Outfitters, Inc., No. 2:99-CV-140, U.S. Dist. Lexis 25198, at *7-8 (D. Vt. Nov. 29, 2001)(notice and cure waived where defendant informed plaintiff that it had no intention of curing the alleged default).

As discussed, New York's exception does not apply under the circumstances of this case. MetTel did not unequivocally repudiate any further performance. It invited comments from

Best, and left open the possibility of future service.  Moreover, MetTel could have easily cured

its breach.  If notice seemed futile to Best, it was only because it could not help Best avoid the

payment of the approximate $82,000 to continue MetTel's dial tone service.

> ## 2.      Equitable Estoppel

Best makes the related argument that MetTel should be estopped from insisting on Best's

compliance with the notice and cure provisions.  (See Best's Proposed Findings & Conclusions,

at pp. 52-54.)  "Under New York law, the elements of equitable estoppel are with respect to the

party estopped: (1) conduct which amounts to a false representation or concealment of material

facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of

the real facts. . . .  The parties asserting estoppel must show with respect to themselves: (1) lack

of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of

the party to be estopped; and (3) prejudicial changes in their positions."  Babitt v. Vebeliunas (In

re Vebeliunas), 332 F.3d 85, 93-94 (2d Cir. 2003).

Best points to two items to support its estoppel claim.  First, MetTel sent Best a final

disconnect notice under the parties' 1999 Contract, and then suspended Best's service before the

10 day payment period had expired, relying on a "trumped up" charge that MetTel suspected

fraud.  (Best's Proposed Findings & Conclusions, at ¶¶ 42-55.)  Second, at the time of the

hearing on the Natelco sale motion, MetTel's attorney, Burton Weston, Esq., assured Best's

attorney, Mayne Miller, Esq., that MetTel would not terminate Best's service because of the

unrelated debt owed to MetTel.  (Id. at  ¶¶ 66-68.)  As a result, Miller did not press Best's

objection to the sale motion in Natelco's bankruptcy case.

-14-

### a.        The December 2000 Suspension of Service

The circumstances involving the suspension of service in December 2000 did not give rise to an estoppel.  First, Best failed to identify a knowing misrepresentation of fact.  Second, it failed to show that it relied on what had occurred in December 2000 when it decided not to provide MetTel with notice or an opportunity to cure the May 2001 breach.  In fact, Chaite testified on cross-examination that after he complained to MetTel about the premature suspension of service in December 2000, MetTel reversed the suspension orders, and restored service.  (Tr. (12/14) at 16-17.)  This suggests that MetTel would have cured its breach if Best had complained.

### b.        Statements by MetTel's Counsel

The assurances attributed to MetTel's counsel at the April 2001 Natelco sale hearing also failed to justify the application of equitable estoppel.  First, there was no evidence that the statement attributed to Mr. Weston was a knowing misrepresentation of fact.  Second, while the statement might have induced Best not to press its objection to the sale, Best did not offer any credible evidence that it relied on Mr. Weston's statement in failing to provide notice and an opportunity to cure.  Third, the evidence showed that Mr. Miller did not rely on Weston's statement for any reason.  Mr. Miller testified that he did not speak at the sale hearing because it appeared that MetTel had already been selected, the hearing went on to other matters, the courtroom was so crowded that he couldn't note his appearance, and the court began taking bids on other assets.  (Tr. (12-13), at 10-11.)  Consequently, he "elected not to interrupt."  (Id. at 11.)  Moreover, Best filed a notice of appeal from the April 25th bench order, but its appeal was dismissed on September 6, 2001, based on the failure to prosecute it.

### 3.    The Recovery of Lost Profits

Upon proof of a breach, the aggrieved party may recover general damages without regard to the contemplation of the parties.  See 3 DAN B. DOBBS, DOBBS LAW OF REMEDIES § 12.4(7), at 98 (1993) ("DOBBS").  General damages are those that flow naturally and probably from the breach.  American List Corp. v. U.S. News & World Report, Inc., 549 N.E.2d 1161, 1164 (N.Y. 1989); Kenford Co. v. County of Erie, 537 N.E.2d 176, 178 (N.Y. 1989); see Schonfeld v. Hilliard, 218 F.3d 164, 175 (2d Cir. 2000)("A plaintiff is seeking general damages when he tries to recover 'the value of the very performance promised.'") (quoting 3 DOBBS § 12.2(3) , at 39). If a contract imposes an obligation to pay a specific sum, the breach gives rise to a claim for general damages to recover the unpaid sum.  American List Corp., 549 N.E.2d at 1164; 3 DOBBS § 12.2(3), at 41.  In contrast, special or consequential damages "seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach."  Schonfeld, 218 F.3d at 176.

Citing American List, MetTel contends that its claim for lost profits seeks general damages.  (Reply of Claimant Manhattan Telecommunications Corporation to the Proposed Findings of Fact and Conclusions of Law of Debtor Best Payphones, Inc., dated Feb. 13, 2007, at 30-31 (ECF Doc. # 649).)  I disagree.  The Natelco Agreement did not require Best to pay a specific sum.  Rather, it imposed the obligation to pay fees based on the number of payphones and their usage.  Moreover, MetTel does not seek to recover the market value of Best's promised performance.  It seeks to recover the benefits of that future performance minus the expenses saved.  Its claim is for lost profits, the quintessential form of consequential or special damages. See 3 DOBBS § 12.2(3), at 41-42.

A party seeking to recover lost profits must demonstrate that (1) its damages were caused by the breach, (2) the damages are not speculative, and instead, are reasonably certain and traceable to the breach, and (3) the particular damages were fairly within the contemplation of the parties at the time that the contract was made. Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1577 (2d Cir. 1994); Ashland Mgmt. Inc. v. Janien, 624 N.E.2d 1007, 1011 (N.Y. 1993); Kenford Co. v. County of Erie, 493 N.E.2d 234, 235 (N.Y. 1986). Best contends that MetTel failed to prove that the recovery of lost profits was within the contemplation of Best and Natelco at the time that they entered into the Natelco Agreement, (Best's Proposed Findings & Conclusions, at pp. 33-37), primarily for two reasons. In December 2000, Best was operating its payphones under the threat that the City of New York would terminate its right to continue to do so.[8] According to Best, it is inconceivable that it would have agreed to remain liable for lost profits in the face of a possible shutdown. (Id. at p. 35.) In addition, Best maintains that the Natelco Agreement limited its post-termination liability to past due fees. (See id. at 34.)

The "contemplation of the parties" test originated with Hadley v. Baxendale, and imposes a test of foreseeability:

> The rule that damages must be within the contemplation of the parties is a rule of foreseeability. The party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made. The breaching party need not have foreseen the breach itself, however, or the particular way the loss came about. It is only necessary that loss from a breach is foreseeable and probable.

Ashland Mgmt., 624 N.E.2d at 1010; accord RCN Telecom Serv., Inc. v. 202 Centre Street Realty LLC, 156 Fed. Appx. 349 (2d Cir. 2005); Schonfeld, 218 F.3d at 172. In this case, logic

---

[8]    Best's problems with the City are recounted in In re Best Payphones, Inc., 279 B.R. 92 (Bankr. S.D.N.Y. 2002).

and the contract's language support a finding that the parties contemplated the recovery of lost

profits.  First, the Natelco Agreement imposed just one obligation on Best: to pay fees in

exchange for dial tone service.  The failure to pay the fees directly and predictably flowed from

Best's early termination.  MetTel's claim for lost profits is simply one for the lost fees.

Second, although the Natelco Agreement limited Natelco's liability for "lost revenues or

profits" to those arising from gross negligence or willful misconduct, (MX 11, at ¶ 12), no

corresponding provision insulated Best from liability for lost profits if it breached the Natelco

Agreement.  Hence, the parties' agreement actually discussed lost profits, but limited the liability

of only one of the parties.[9]  Cf. Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d

326, 334 (2d Cir. 1993)(lost profits not within the contemplation of the parties where the parties'

agreement did not mention damages, and their prior agreement contained an express limitation

on damages.)

Best's contrary arguments lack merit.  While it faced regulatory problems with New York

City, and the possibility that the City might terminate its operations, this never occurred.  Thus,

even if Natelco and Best contemplated that a City-induced termination would relieve Best of its

---

[9]       Here, and in other places, Best emphasizes that the Natelco Agreement was a one-sided, preprinted form
prepared by Natelco.  Hence, Best says, it should be construed against MetTel.  There are at least two responses.
First, the rule of contract interpretation cited by Best, contra proferentem, is one of last resort, which applies after all
other aids to interpretation have been exhausted. O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc., 37
F.3d 55, 61 (2d Cir. 1994); Record Club of America Inc., v. United Artists Records, Inc., 890 F.2d 1264, 1271 (2d
Cir. 1989); Schering Corp., v. Home Ins. Co., 712 F.2d 4, 10 n.2 (2d Cir. 1983).  The rule does not compel a court
to credit any and every interpretation offered by the non-drafting party.  Second, the terms of the Natelco Agreement
were plainly negotiable.  When Best and Natelco entered into their 1998 agreement, they negotiated changes that
appeared as handwritten interlineations on the 1998 contract.  (See BX S.)

        Best did not, however, negotiate any changes to the 2000 Natelco Agreement.  Chaite testified that he met
with Natelco's agent, Joe Margullo, a day or two before the Natelco Agreement was signed.  (Tr. (12-13) at 33.)
Chaite told Margullo that Best didn't have a franchise, and that the phones were subject to removal.  (Id. at 34.)
Margullo responded "good luck," (id.), and this was the total discussion on the point.  The parties never discussed
any limit on Best's liability.

prospective obligation to pay fees – a finding not supported by the evidence -- it does not follow

that every other termination would similarly exonerate Best.  In other words, there is no evidence

of the joint contemplation that Best could unilaterally terminate the Natelco Agreement without

liability, particularly since a specific provision of the contract conditioned Best's right to

terminate on (a) a material breach by MetTel, (b) notice and an opportunity to cure, and (c) the

failure to cure within 10 days.

Best's reliance on Goodstein Constr. Corp. v. City of New York, 604 N.E.2d 1356 (N.Y.

1992) is misplaced.  There, New York City entered into letter agreements with the plaintiff,

which granted it the exclusive right to negotiate a land disposition agreement ("LDA") for the

purchase and development of two sites, one commercial and the other residential.  The aggregate

purchase price was approximately $28 million.  The City had the right to terminate negotiations

at any time, and the LDA required the approval of the affected Community Board, the City

Planning Commission and the Board of Estimate.  The City subsequently fired the plaintiff, and

no LDA was ever concluded.  Id. at 1357-58.  The plaintiff then sued the City, seeking $799

million in lost profits, predicated on the hypothetical LDA.

The Court of Appeals ruled that the recovery of lost profits was not within the

contemplation of the parties.  The LDA required several layers of governmental approval.  The

lost profits claim essentially made the City a guarantor of an LDA to which neither party had

agreed for profits from projected improvements that the plaintiff would never construct.  Id.  The

Court concluded that in signing the letter agreements, "[i]t can hardly be supposed that . . . the

City officials envisioned that they were exposing the City to liability for catastrophic proportions

when the other party was assuming no liability whatsoever," or that "they could have

contemplated that . . . they were subjecting the City to such an unfair and one-sided allocation of

the risks." Id. at 1362.

Here, MetTel is suing under a contract that both parties signed to recover fees that Best agreed to pay.  In addition, the Natelco Agreement only ran for one year, and MetTel is seeking its lost profits for only a few months.  Hence, it is not inconceivable, irrational or illogical for the parties to have contemplated that Best assumed the risk of MetTel's lost revenue stream – the object of its bargain – if Best wrongfully terminated the contract.[10]

In addition, the Natelco Agreement did not limit Best's liability to the past due charges. Paragraph 5, on which Best relies, addressed Natelco's rights in the event of Best's default.  It granted Natelco a choice of one or more remedies, including termination of the Agreement, suspension of service, application of any security deposit to arrears and "any other legal remedies available to it."  The paragraph concluded, "[a]ny termination of the Agreement shall not relieve Owner [Best] of its obligation to pay any charges incurred prior to the termination and fulfill all other obligations arising prior to or as a result of such termination."  Seizing on this last sentence, Best contends that it relieved Best of the obligation to pay any post-termination charges that would have accrued but for its breach.

Assuming that Best has correctly interpreted paragraph 5, it is nonetheless inapplicable. Paragraph 5 dealt with a Best default and Natelco's remedies.  Natelco had the option to terminate the contract.  The limiting provision relied on by Best referred to a termination under

---

[10]        Trademark Research Corp. is also distinguishable.  There, the Court concluded that the parties did not contemplate the recovery of lost profits because their informal agreement did not discuss damages while their earlier agreement contained damage limitations, and there was no specific evidence that at the time of contracting, the defendant accepted liability for nine years of lost profits.  995 F.2d at 334.  As noted, the Natelco Agreement did include a provision that limited Natelco's liability for lost profits.

that paragraph, i.e., a termination by Natelco.  In this case, however, Best, not MetTel,

terminated the contract.  In fact, the Notice of Disconnection threatened a variety of remedies,

but not termination.  MetTel warned Best that it would suspend and thereafter disconnect service

if Best failed to pay.  Although the notice stated that MetTel will "cancel your account," Best

could reestablish service following cancellation by paying the account balance, a new connection

charge, and possibly, a deposit.

### 4.    The MetTel Tariff

In an earlier motion for summary judgment, Best argued that it had the right to terminate

the Natelco Agreement under paragraph 10 based on a material and adverse change in the "terms

or rates for services."  The Court reserved decision.  Addressing that question along with the

other defenses to liability raised by Best at trial, the Court concludes that paragraph 10 did not

justify a termination by Best.

Paragraph 10 stated that

[n]otwithstanding anything to the contrary in this Agreement, all services shall be
governed by NATELCO's tariff on file with the applicable public service
commission, and in the event of any conflict between the tariff and this
Agreement, the terms of the tariff shall govern.  Either party may terminate this
agreement if the terms or rates for services under this agreement are materially
and adversely altered by a final, non-appealable order of a judicial or regulatory
body or Incumbent Local Exchange Carrier.

(Emphasis added.)  Best contends that the MetTel tariff supplanted the Natelco tariff following

the Natelco sale, and imposed harsher terms.  Specifically, the Natelco tariff exonerated Natelco

from liability for service-related errors interruptions and delays "in the absence of gross

negligence and/or willful misconduct"  (See Natelco Tariff, § 3.2.2.)[11]  The MetTel tariff

---

[11]    An excerpt of the Natelco Tariff is attached as Exhibit 18 to the Declaration of Michael Chaite in Support
of Motion for Partial Summary Judgment, dated Sept. 18, 2006 ("Chaite Declaration") (ECF Doc. # 560.)

contained a broader exoneration clause.  It stated that "[t]he Company will not be liable for any special, consequential, exemplary or punitive damages a Customer may suffer, whether or not caused by the intentional acts or omissions or negligence of the Company's employees or agents."  (See MetTel Tariff, at Exhibit 19, § 2.1.2(d).) [12]

Best's argument assumes that the assignment of the Natelco Agreement substituted the MetTel Tariff for the Natelco Tariff.  The supposition may be wrong.  The Sale Order approved the assumption and assignment of the "Customer Contracts" to MetTel.  (See MX 32, at ¶ 14.)  A trustee assumes an executory contract under § 365 of the Bankruptcy Code cum onere, that is, with all of its burdens.  NLRB v. Bildisco & Bildisco, 465 U.S. 513, 531-32 (1984).  The trustee can only assign what he assumes, and the assignee cannot impose terms, implicitly or explicitly, that render performance less onerous to the assignee or more onerous to the non-debtor party to the contract.  In other words, there is a substantial question whether the assumption and assignment of the Natelco Agreement worked the change that Best fears.

Even if it did, the MetTel Tariff's limitation on liability did not materially and adversely affect the "terms or rates for services" under the Natelco Agreement.  MetTel continued to provide the same dial-tone services at the same rate, keyed to the Verizon 900 Tariff. Accordingly, Best was not entitled to terminate the Natelco Agreement based on paragraph 10.

## 5.    "Slamming"

Best devotes the largest segment of its post-trial submission to the issue of "slamming." (See Best's Proposed Findings & Conclusions, at 38-48.)  "Slamming" refers to the unauthorized

---

[12]    An excerpt of the MetTel Tariff is attached as Exhibit 19 to the Chaite Declaration.

change to a subscriber's telephone service.  <u>AT&T Corp. v. FCC</u>, 323 F.3d 1081, 1082 (D.C.

Cir. 2003); <u>AT&T Corp.</u>, 19 F.C.C.R. 3726, 3726-27 (2004).  It involves a deceptive practice

that deprives the subscriber of its chosen carrier, and the latter of its customer:

> Slamming occurs when a company changes a subscriber's carrier selection
> without that subscriber's knowledge or explicit authorization.  Slamming nullifies
> the ability of consumers to select the telecommunications providers of their
> choice.  Slamming also distorts the telecommunications market because it rewards
> those companies who engage in deceptive and fraudulent practices by unfairly
> increasing their customer base at the expense of those companies that market in a
> fair and informative manner and do not use fraudulent practices.

<u>Implementation of the Subscriber Carrier Selection Changes Provisions of the Telecomm. Act of</u>

<u>1996 [etc.]</u>, 14 F.C.C.R. 1508, 1510-11 (1998) (Second Report and Order and Further Notice of

Proposed Rule Making.)

Best argues, in the main, that the assignment of the Natelco Agreement to MetTel without

Best's consent constituted "slamming," and allowed Best to terminate the contract.  In addition,

Best maintains that the procedures approved in the FCC Order allowed Best to refuse further

service from MetTel, and again, to terminate the Natelco Agreement.  Finding neither argument

persuasive, I reject the "slamming" defense to liability.

### a.      Applicable Non-Bankruptcy Law

Section 258 of the Telecommunications Act of 1996, 47 U.S.C. § 258, was adopted to

combat "slamming."  <u>See</u> <u>AT&T Corp. v. FCC</u>, 323 F.3d at 1082.  It provides:

> (a)  Prohibition.  No telecommunications carrier shall submit or execute a change
> in a subscriber's selection of a provider of telephone exchange service or
> telephone toll service except in accordance with such verification procedures as
> the Commission shall prescribe.  Nothing in this section shall preclude any State
> commission from enforcing such procedures with respect to intrastate services.

> (b)  Liability for charges.  Any telecommunications carrier that violates the
> verification procedures described in subsection (a) and that collects charges for

telephone exchange service or telephone toll service from a subscriber shall be liable to the carrier previously selected by the subscriber in an amount equal to all charges paid by such subscriber after such violation, in accordance with such procedures as the Commission may prescribe. The remedies provided by this subsection are in addition to any other remedies available by law.

Section 258(a) does not contain a customer consent requirement. <u>AT&T Corp. v. FCC</u>, 323 F.3d at 1087. Instead, it authorizes the FCC to prescribe verification procedures, and prohibits a carrier from submitting or executing an order to change a subscriber's carrier without complying with the prescribed procedures. Section 258(b) imposes financial penalties against the unauthorized, or slamming carrier, in favor of the authorized carrier selected by the subscriber, for violations of the prescribed procedures. The verification procedures adopted by the FCC, as of April 2001, were set forth in 47 C.F.R. § 64.1120(a)-(c), and provided, in pertinent part, that no carrier change could be executed or submitted without the subscriber's authorization. 47 C.F.R. § 64.1120(a)(1).

Contrary to Best's core argument, non-bankruptcy telecommunications law does not give a subscriber the absolute right to change carriers at any time, nor would it be expected to. The anti-slamming rules are primarily aimed at protecting residential customers who do not have contracts. (<u>See</u> Tr. (12-4) at 34-35.) Such customers are free to change their carriers at will, and do not require a federal statute or rule granting that right. If a service contract exists, however, the anti-slamming rules do not modify the parties' contract rights or obligations. <u>See Implementation of the Subscriber Carrier Selection Changes Provisions of the Telecomm. Act of 1996; Bell Atlantic Communications, Inc. [etc.]</u>, 15 F.C.C.R. 24680, 24683 n.16 (2000)(FCC Order approving limited waiver petition that provided for transmission of notification letter advising certain business customers that "the customer's option to choose a different carrier is

subject to the terms and conditions of its plan").[13]

Rather, consistent with 47 U.S.C. § 258(b), the anti-slamming rules impose monetary penalties on the "slammer."  The unauthorized carrier is liable to the authorized carrier for 150% of any fees paid by the unwitting subscriber.  47 C.F.R. § 64.1140(a).  If the subscriber has not paid the unauthorized carrier, the subscriber is absolved from any liability for services provided by the unauthorized carrier within 30 days of the unauthorized change.  Id. § 64.1140(b).  After the 30-day period, it must pay the authorized carrier, at the authorized carrier's rates, for any services provided by the unauthorized carrier.  Id.

### b.    The Bankruptcy Code and the Natelco Sale Order

Nothing in the "anti-slamming" statute or regulations purports to affect or invalidate service agreements between a subscriber and its carrier.  But even if these provisions imply that a service agreement cannot be assigned to another carrier without the subscriber's consent, that argument is foreclosed, at least in this case, by the Sale Order.  Generally speaking,  § 365 of the Bankruptcy Code authorizes a trustee or debtor in possession to assume and assign executory contracts and unexpired leases.  Executory contracts and unexpired leases are often the estate's most valuable assets.  To maximize their value, § 365(f) invalidates, inter alia, laws that prohibit or restrict their assignability:

> (f) (1) Except as provided in subsection (c) of this section, notwithstanding a
> provision in . . . applicable law, that prohibits, restricts, or conditions the
> assignment of such contract or lease, the trustee may assign such contract or lease

---

[13]     MetTel attached the waiver petition in the Bell Atlantic case to its proposed findings of fact and conclusions of law, and Best referred to certain FCC petitions filed by other carriers in other cases.  Neither party offered these other petitions at trial.  Moreover, Best relied on the other petitions in its post-trial submission to challenge the veracity of the representations made by MetTel in the FCC Petition.  (See Best's Proposed Findings & Conclusions, at 46-47.)  Best's challenge to the FCC Order, six years after it was issued, goes well beyond the jurisdiction of this Court.

under paragraph (2) of this subsection. . . .

    . . . .

  (3) Notwithstanding a provision in . . . applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee.

Best objected to the Natelco sale, but never argued that the Natelco Agreement fell within the exception under § 365(c)(1), and could not be assigned without its consent.[14]  To the contrary, Best acknowledged that "[t]he public interest, as well as the contractual rights and business interests of Best, would not be served by allowing its executory contract with Natelco to be deemed rejected.  The opposition of Best to [Natelco's] motion therefore does not object to the concept of the assumption of the executory contract."  (MX 14, at ¶ 6.)  Instead, Best objected to MetTel, and expressed its concerns about the adequacy of MetTel's future performance.  (Id. at ¶ 12.)

The Sale Order overruled this as well as all other unresolved objections, (MX 32, at ¶ 2),

---

[14]    Section 365(c)(1) states:

(c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if –

  (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and  (B) such party does not consent to such assumption or assignment.

    "Section 365(c) is directed to contracts that, regardless of their provisions, would not be assignable under applicable nonbankruptcy law."  In re Patient Educ. Media, Inc., 210 B.R. 237, 242 (Bankr. S.D.N.Y. 1997). "Generally, a right is not assignable if assignment would materially change the duty of the obligor, increase his burden or risk or impair the chance of receiving a return performance or reduce its value."  In re Schick, 235 B.R. 318, 323 (Bankr. S.D.N.Y. 1999).  Personal service contracts are the paradigmatic non-assignable contracts, although not the sole type.

and authorized Natelco to assume and assign the Customer Contracts to MetTel.  (Id. at ¶¶ 14-

15.)  The Sale Order declared that the transfer of Natelco's assets was legal, valid and effective,

and vested MetTel with "all right title and interest of the Debtors in and to the Sale Assets

(including the Customer Contracts)."  (Id. at ¶ T.)  Furthermore, "Customer Contracts shall be

transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance

with their respective terms, excluding and notwithstanding any provision in any such Contract

(including those described in section 365(b)(2) and (f) of the Bankruptcy Code[)] that prohibits,

restricts, or conditions such assignment or transfer to the Purchaser."  (Id. at ¶ 16.)  The Sale

Order did not condition its effectiveness on regulatory approval of any part of the transaction. [15]

Furthermore, Best appealed from the bench ruling, but the appeal was dismissed six months later

for failure to prosecute.

Accordingly, Best's arguments that 47 U.S.C. § 258, the corresponding regulations or

non-bankruptcy law prohibited the assignment of the Natelco Agreement without its consent, or

the assignment allowed it to terminate the Natelco Agreement, are foreclosed by the Sale Order

and 11 U.S.C. § 365(f). [16]

### c.    The FCC and NYPSC Orders

The exigent circumstances surrounding the Natelco sale did not permit the parties to

---

[15]    The only relevant reference to non-bankruptcy law in the Sale Order, in ¶ 8, stated that all parties "shall cooperate and act in accordance with applicable nonbankruptcy law (including all applicable tariffs) with respect to the migration of the Debtor's customers."  "Migration" referred to the actual switching of the customers from Natelco's lines to MetTel's lines.  Paragraph 8 did not grant Best the right to terminate the Natelco Agreement in contravention of § 365(f) or the specific assumption and assignment provisions in the Sale Order.

[16]    Best's post-trial submission includes criticism of the sufficiency of the notice it received in connection with the Natelco sale motion.  (Best's Proposed Findings & Conclusions, at 44 & n.10.)  Best cannot collaterally attack the Natelco court's noticing procedures in this proceeding.

procure the regulatory verifications before MetTel took over for Natelco.  As described above,

MetTel petitioned the FCC and the NYPSC to allow the deal to proceed, and notified the

customers after the fact.  Initially, Chaite testified that Best never received either notification

letter.  (Tr. (12-13) at 127.)  Economou, who oversaw the notification process, conceded at trial

that he did not personally "stuff the envelopes."  (Tr. (12-4) at 103.)  I nevertheless find that at a

minimum, Best received the second notification.  The second notification was sent in early May

with the "April 1, 2001" bill.  The bill stated, on its face, "PLEASE SEE ATTACHED

WELCOME LETTER."  (MX 22.)  The "WELCOME LETTER" referred to the second

notification.  (Tr. (12-4) at 45.)  Chaite admitted receiving and probably opening the April bill,

but not asking MetTel for a copy of a missing "Welcome Letter."  (Tr. (12-13) at 131.)  I infer

from his testimony that the notification letter was included with the bill.

In any event, Best's receipt of the notification is beside the point.  Best changed carriers

within a few days of receiving the April bill, and before the Sale Order was even signed.  The

FCC Order was designed to comply with the FCC verification and customer authorization rules,

and did not change the parties' substantive rights.  Best either had the right to change carriers

without penalty, or it did not.  If Best had that right, the lack of notice of that right is irrelevant

because Best exercised it anyway.  In that case, MetTel cannot recover lost profits.  If, on the

other hand, Best did not have the right to change carriers because its contract prevented it from

doing so, the failure to receive notice of a right it could not exercise is similarly irrelevant.

Best goes further, and also appears to contend that the FCC Order gave it an independent

right to terminate the Natelco Agreement.   In other words, MetTel waived its right to insist on

compliance with the terms of the assigned service agreements when it petitioned the FCC.  The

FCC Order was concerned with the timing of the customer notification, nothing more or less.  It

confirmed the general right to change carriers, "subject to the terms and conditions of any applicable agreements."  Nothing in the FCC Order suggested that it was intended or capable of altering the parties' contractual arrangements.  Economou, who oversaw the preparation of the notification letters and the FCC Petition, testified that the limitation in the letter was intended to provide notice to those who had signed service agreements that they would continue to be bound by their agreements.  (See (Tr. 12-4) at 40.)  Indeed, MetTel had priced the Natelco transaction based on the revenues that would be generated by the existing service agreements.  (Tr. (12-4) at 19.)  There is no evidence that the notification language was intended to waive any contractual rights, or create an independent right to terminate a service agreement.[17]

        The foregoing disposes of all but one of the arguments relating to the NYPSC Order.  The New York anti-slamming law serves the same purpose as the federal law and regulations.  See 1997 N.Y. SESS. LAWS 2652-54 (McKinney).  The New York law prohibits unauthorized changes in carriers unless the new carrier "complies with the authorization and confirmation procedures established by the commission and by federal law and rules."  N.Y. PUB. SERV. § 92-e (2) (McKinney 1993).  Violations are subject to monetary penalties.  Id. §§ 25, 92-e (6).  Hence, New York law does not address the question of the assignment of service agreements or the need for the subscriber's consent to such an assignment.[18]  Even if it did, the argument is foreclosed by the Sale Order for the reasons already stated.

---

[17]        Best refers to the notification letters sent by other carriers in other situations, and draws distinctions between their language and the language used by MetTel.  (Best's Proposed Findings & Conclusions, at 39.)  This may mean that Best could have said it more clearly.  But Best has not offered any reasonable alternative to MetTel's interpretation of the language approved by the FCC Order.

[18]        Best also refers, without elaboration, to § 99(2) of the Public Service Law.  That provision deals with limitations on the transfer of franchises, franchise rights, systems or works.  It does not concern service agreements or subscriber contracts.

Nevertheless, the NYPSC Order only granted prospective approval, i.e., as of May 23, 2001. By then, MetTel had migrated most if not all of Natelco customers, and Best had repudiated the Natelco Agreement and switched to Bridgecom. Best concludes that any actions taken by MetTel before that date were improper and without authority. (Best's Proposed Findings & Conclusions, at ¶ 84.) It does not cite any authority for this proposition, or explain how the prospective effect of the NYPSC waiver affected the transaction or the legitimacy of MetTel's actions that were sanctioned by the Bankruptcy Court and the FCC Order.

On the contrary, the assumption and assignment of the Natelco Agreement was authorized by the Sale Order, and did not depend on regulatory approval. Furthermore, the Sale Order declared that the Customer Contracts were in full force and effect, (MX 32, at ¶ 16), and that the transfer of the Customer Contracts will be a legal, valid and effective transfer. (Id. at ¶ T.) These provisions predated the NYPSC Order, and did not depend on whether or when the NYPSC got around to approving the limited waiver. Moreover, the failure to obey the state anti-slamming laws may subject an unauthorized carrier to monetary penalties enforceable by and payable to the State of New York rather than the subscriber.[19] N.Y. PUB. SERV. §§ 24, 25(5), 92-e (6)(b). As with the federal scheme, New York's anti-slamming provisions do not invalidate service agreements.

Based on the foregoing discussion, MetTel proved at trial that Best breached the Natelco Agreement, and Best failed to show a factual or legal defense to its liability. I now turn to the amount that MetTel is entitled to recover on its claim for lost profits.

---

[19]    There was no evidence that the NYPSC has ever sued MetTel judicially or administratively to recover penalties for the slamming of the Natelco subscribers.

B.    **Damages**

As discussed, MetTel's lost profits consist of the lost revenues less the expenses saved

over the remaining life of the Natelco Agreement.  Indu Craft v. Bank of Baroda, 47 F.3d 490,

495 (2d Cir. 1995)(in computing a plaintiff's damages, the revenues "due a plaintiff because of a

breached contract must be offset by any amount Plaintiff saved as a result of the breach," which

"usually consists of variable costs, that is, those costs that would have been incurred solely as a

result of performance under the contract").  Where liability has been shown, the injured party is

not required to prove its damages to a mathematical certainty:

> New York courts do not require scientific rigor in the calculation of damages.
> When it is certain that damages have been caused by a breach of contract, and the
> only uncertainty is as to their amount, there can rarely be any good reason for
> refusing, on account of such uncertainty, any damages whatever for the breach.  A
> person violating his contract should not be permitted entirely to escape liability
> because the amount of the damage which he had caused is uncertain.

Lexington Prods. Ltd. v. B.D. Commc'ns, Inc., 677 F.2d 251, 253 (2d Cir. 1982) (citations

omitted); accord Aqua Dredge, Inc. v. Stony Point Marina & Yacht Club, Inc., 583 N.Y.S.2d

648, 650 (N.Y. App. Div. 1992) ("In computing damages for breach of contract, mathematical

certainty is rarely attained or even expected").  "[I]f a plaintiff has shown it more likely than not

that it has suffered damages, the amount of damages need only be proved with reasonable

certainty," and "[t]he wrongdoer must shoulder the burden of the uncertainty regarding the

amount of damages."  Indu Craft, 47 F.3d at 496.

Best breached the Natelco Agreement on May 15, 2001.  The contract ran until January

31, 2002, and eight-and-one-half months remained.  Had Best not breached the Natelco

Agreement in May 2001, MetTel would have provided local and regional service to Best's

payphones through January 31, 2002 and Best would have been obligated to pay MetTel for that

service in accordance with the pricing terms set forth in paragraph 4 of the Natelco Agreement.

(MX 11; Tr. (12-4) at 65.)  MetTel's damage calculations ignored the balance of May 2001, and

computed its injury as if the contract was breached on May 31, 2001.

Economou testified credibly that Best's breach caused MetTel to suffer $238,082.43 in

damages.  This amount represented the difference between (a) $446,959.54 in gross income

MetTel lost when Best terminated the Natelco Agreement eight months before it had a right to do

so, and (b) the $208,877.11 in costs MetTel saved as a result of Best's breach.  He calculated the

amount that Best would have paid for telephone service over the remaining eight-month term

based upon the amount of service that MetTel provided to Best for more than a year under the

parties' 1999 Contract.  Where the party seeking damages for breach of contract "has shown a

track record of sales before [the] other party's breach," its prior experience supplies a basis for

"determining with some specificity the financial repercussion of [the] breach."  Lexington

Products Ltd.., 677 F.2d at 254; accord Care Travel Co. Ltd. v. Pan Am. World Airways, Inc.,

944 F.2d 983, 994 (2d Cir. 1991) (sales data enabled jury to estimate amount of revenue lost

when defendant breached exclusive agency agreement); see Merlite Indus., Inc. v. Valassis

Inserts, Inc., 12 F.3d 373, 376 (2d Cir. 1993) (lost profit evidence sufficient where "Merlite, an

established business, offered statistical evidence of its past performance in a remarkably similar

advertising program").

Economou used the rates set forth in the Natelco Agreement, including the 25% discount

from the rates charged in Verizon's 900 Tariff for the recurring feature and usage portion of each

monthly invoice.[20]  (Tr. (12-4) at 73.)  Economou examined MetTel's billing records for Best's

---

[20]        Best was not entitled to a discount on surcharges.  (See MX 11, at ¶ 4(b)(iii); Tr. (12-4) at 121-22.)  The
monthly FCC line charge and number portability charge were surcharges.  (Tr. (12-4) at 69.)

payphones for the calendar year 2000, and determined the total number of day, evening, night,

and regional calls made on Best's payphone lines over that twelve-month period.  Relying on this

historical information, MetTel would have charged Best $446,959.54 for local and regional

telephone service under the Natelco Agreement between June 1, 2001 and January 31, 2002,

based upon five factors or component charges:

| | |
|---|---|
| Estimated line charges and surcharges | $166,579.20 |
| Estimated day charges | 157,453.69 |
| Estimated evening charges | 36,632.36 |
| Estimated night charges | 79,528.78 |
| Estimated regional charges | 6,765.51 |
| | $446,959.54 |

(MX 2, at MET 05; Tr. (12-4) at 73-82; <u>see also</u> MX 2, at MET 02, MET 03; MX 2A.).

MetTel used Verizon's wholesale tariff and MetTel's own historical usage data to

calculate the expenses that it saved.  Economou identified the unbundled network elements that

made up the services it provided to Best and the amount it cost MetTel to purchase these services

from Verizon under the applicable Verizon tariffs and bills.  (Tr. (12-4) at 66-67, 71; MX 2, at

MET 07-08, MET 22-37.)  Absent Best's breach, MetTel would have incurred $208,877.11 in

direct costs to provide service to Best's lines from June 1, 2001 through January 31, 2002.  The

costs consisted of the following average monthly Verizon charges:

| | |
|---|---|
| Local loops | $11,722.24 |
| Port charge | 2,410.00 |
| Usage (day, night, evening) | 3,430.80 |
| Usage (regional) | 2,732.40 |
| Unbundled Common Transport Charge | 5,814.20 |
| | $26,109.64 |

(MX 2, at MET 07-08, MET 09, MET 10, MET 22, MET 31, MET 33; Tr. (12-4) at 82-91.)

Multiplying these average monthly costs by the remaining term of eight months, MetTel saved

$208,877.11 in costs, and its lost profits totaled $238,082.43.

Best did not offer any damage evidence of its own.  It does, however, dispute certain

assumptions made by MetTel, its methodology, and its legal entitlement under theories of

contract and equitable estoppel.  These challenges lack a legal or factual basis, and are rejected.

### 1.    Calculations Based on the UNE Platform

MetTel provided services to Best through its UNE-P, or unbundled network elements

platform.  (Tr. (12-4) at 95.)  The UNE-P provider purchases all of its underlying network

elements needed to provide service.  (Id.)  As an alternative, a provider can use a facilities-based

approach.  (Id.)  There, the provider would purchase a communications loop, connect the loop to

its own facilities, and provide the switching functionality off of its own switch.  (Id. at 95-96.)

The facilities-based approach requires a greater expenditure of capital, but results in a much

lower cost to the provider on a profit and loss basis.  (Id. at 98-99.)  Finally, a provider can buy

and resell services provided by an Incumbent Local Exchange Carrier ("ILEC"), such as

Verizon.  (Id. at 96.)   MetTel had provided services to Best through UNE-P under the 1999

contract and the Natelco Agreement, (id. at 94-95), and its damage calculations assumed that it

would continue to do so over the remainder of that contract.

Best took issue with MetTel's assumption that Natelco provided services through UNE-P

under the Natelco Agreement.  There was no evidence to support Best's challenge, and

substantial, credible evidence to refute it.  MetTel was intent on acquiring a customer base that

was already serviced on UNE-P because it could smoothly transfer the customers to its own

UNE-P.  (Id. at 99-100.)  Economou oversaw the due diligence relating to the Natelco

transaction, and satisfied himself that Natelco used a UNE-P.  (Id.)  Moreover, although MetTel

stated in the petition to the NYPSC that Natelco provided facilities-based services, (MX 20, at

2), it also advised the NYPSC that it was acquiring only those New York customers that it could

serve on its UNE-P.  (Id. at 4.)  Best was one such customer.  Moreover, the Asset Purchase

Agreement stated that the purchase price included the costs incurred by Natelco for UNE-P

services from Verizon to support the Customer Contracts between the closing date and two days

after the completion date.  (MX 3, at ¶ I.2(1).)

Best nevertheless finds support for this argument in certain entries in the Natelco bill for

the month of March 2001.  The trial exhibit (MX 2) detailed the line charges attributable to 15

payphone lines. Of the 15 lines, 9 were identified by the notation "UNEP"; the other six were

not. (See MX 2, at MET 19-21.)  Invoking a canon of construction, expression unius est

exclusion alterius, (Best's Proposed Findings & Conclusions, at ¶ 23), Best reasons that the six

lines, and presumably others, were not serviced by UNE-P.  (Id.)

I reject the notion that this principle of construction should be applied to interpret a

telephone bill.  Moreover, I do not infer from these bills, especially in light of Economou's

testimony, that Natelco provided non-UNE-P services to Best.

### 2.    FCC Line Charges

Part of MetTel's monthly bill included an $8.08 charge for each line, denominated an

FCC or EUCL (end user common line) charge.  (See MX 2, at MET 03, 04; Tr. (12-4) at 115.)

The FCC line charge is a surcharge imposed by the FCC that carriers charge to the end user.  (Tr.

(12-4) at 116, 119.)   The Natelco Agreement required Best to pay all applicable surcharges.

(MX 11, at ¶ 4(b)(iii).)  Natelco billed Best for the FCC line charge, (see MX 2, at MET 19-21),

MetTel continued to bill Best for the charge, and the FCC line charge was a common surcharge

that a CLEC like MetTel or Natelco collected and retained.  (See Tr. (12-4) at 115-16, 121-22.)

Best contends that only an ILEC, like Verizon, could collect the FCC line charge.  It

relies on 47 C.F.R.§ 69.104(a), which states:

> This section is applicable only to incumbent local exchange carriers that
> are not subject to price cap regulation as that term is defined in § 61.3(ee) of this
> chapter.  A charge that is expressed in dollars and cents per line per month shall
> be assessed upon end users that subscribe to local exchange telephone service or
> Centrex service to the extent they do not pay carrier common line charges.  A
> charge that is expressed in dollars and cents per line per month shall be assessed
> upon providers of public telephones.  Such charge shall be assessed for each line
> between the premises of an end user, or public telephone location, and a Class 5
> office that is or may be used for local exchange service transmissions.

This regulation applies to EUCL charges (1) imposed by ILECs that (2) are not subject to price cap regulations.  It does not authorize the charge; it limits it.  The regulation does not apply to access charges, which include EULC charges, imposed by CLECs.  See In The Matter Of Access Charge Reform of Access Charges Imposed by Competitive Local Exchange Carriers, 16 F.C.C.R. 9923,  9937 (2001) ("We decline to immediately move CLEC access rates to the rate of the competing ILEC. CLECs have, in the past, set their rates without having to conform to the regulatory standards imposed on ILECs, and this Commission has twice ruled, in essence, that a CLEC's rate is not per se unreasonable merely because it exceeds the ILEC rate.")(footnote omitted).  Furthermore, Best has failed to point to any statute, regulation or judicial or administrative decision that forbids CLECs from collecting the FCC line charge.  This, coupled with the general practice of CLECs to charge and collect the FCC line charges, requires me to reject Best's position.  Best has not challenged the FCC line charges on any other basis (e.g., the amount), and accordingly, they were properly included in MetTel's damage computation.

### 3.    Limiting MetTel's Claim to $84,000

As discussed above, the case was moving toward confirmation at the same time that the parties were engaged in litigation over MetTel's claim.  In the course of this litigation, Aronow, MetTel's co-president, submitted a declaration, in the context of a summary judgment motion,

which fixed the lost profits claim at $84,000.  The Court denied summary judgment on the lost

profits claim based, in part, on the lack of proof.  Best Payphones, Inc., 2002 WL 31767796, at *

10 ("The only evidence on this point came from a conclusory statement that the claim of lost

profits in the sum of $84,000.00 was based on MetTel's "historical experience.").  Best now

argues that MetTel's lost profits claim should be limited to $84,000, based on two theories.

First, its current claim for lost profits of $238,082.43 is an untimely amendment of its $84,000

claim.  (Best's Proposed Findings & Conclusions, at pp. 57-59.)  Second, Best confirmed its

100% plan in reliance on $84,000 figure, and MetTel should be estopped from recovering more

than that amount.  (See id., at ¶¶ 124-25.)  Neither argument has merit.

### a.    Late Amendment

MetTel filed two claims, nos. 3 and 8, at an early point in this case.  Claim no. 3 was

stricken; Claim no. 8 survived.  The lost profits portion of the claim was unliquidated when filed.

MetTel attempted to liquidate it unsuccessfully in the course of the motion for summary

judgment, and sought to liquidate it a second time at trial.  MetTel never filed an amended proof

of claim for lost profits in a liquidated amount.

Best is unable to muster any legal authority for the novel argument that the liquidation of

a claim through litigation constitutes the amendment of that claim. A plan proponent always runs

the risk that an unliquidated claim will turn out to be higher than he thought.  If the debtor needs

to know the amount of an unliquidated claim in order to confirm its plan, and liquidation will

delay the case, it can seek to estimate the claim.  See 11 U.S.C. § 502(c).  Under Best's theory, a

debtor could simply wait until after confirmation to object to an unliquidated claim, and then

argue that any effort to liquidate it would yield an untimely, post-confirmation amendment.

Furthermore, there is a significant difference between filing a proof of claim in a liquidated amount and fixing the amount of an unliquidated claim through litigation. Had Best filed an amended claim for lost profits in the sum of $238,082.43, it would have been deemed allowed unless Best filed an objection to it. 11 U.S.C. § 502(a). Furthermore, the claim would have constituted <u>prima facie</u> evidence of the validity and amount of the debt, FED. R. BANKR. P. 3001(f), and the burden of going forward with the evidence would have shifted to Best. At trial, however, MetTel shouldered the burden of going forward as well as the burden of ultimate persuasion.

### b.    Equitable Estoppel

Best also failed to demonstrate that MetTel should be equitably estopped from recovering its lost profits claim. The elements of equitable estoppel were discussed above. Best filed its 100% plan before MetTel filed the Aronow declaration on September 9, 2002, and filed its amended plan, also a 100% plan, on the same day that MetTel filed the Aronow declaration. Chaite was not sure whether he saw the declaration before he caused Best to file the amended plan. In short, Best failed to show that it relied on the Aronow declaration in formulating its 100% plan.

Best also failed to show that it relied on the Aronow declaration, or the $84,000 estimate, when it confirmed the plan; Chaite's testimony that he did was self-serving and not credible. During the confirmation hearing, Best proffered proof that the total unsecured debt would approximate $665,000, and it had $775,000 available to pay it. (Transcript of Confirmation Hearing, held Dec. 3, 2002, at 20) (ECF Doc. # 286.) The $665,000 estimate included MetTel's unsecured claim, which Best estimated in the amount of $245,000, (<u>id.</u> at 19), and MetTel's attorney estimated at $300,000. (<u>Id.</u> at 18, 19.) It did not include MetTel's judgment claim of

approximately $210,000, which was secured by an appeal bond.  (See id. at 17.)  Neither side's

estimate of MetTel's unsecured claim identified the value ascribed to the lost profit portion.

In any event, the only plan Best could have confirmed was a 100% plan, regardless of

whether MetTel's lost profits claim was $84,000 or $240,000.  At confirmation, Best

demonstrated that it had sufficient cash on hand to confirm its case without regard to the value of

its other assets.[21]  One week after the confirmation hearing, on December 10, 2002, Best filed a

motion to sell those assets.  (Joint Motion for Authority to (1) Sell Property Free and Clear of

Claims, Liens and Encumbrances and (2) Assume and Assign Executory Contracts and/or

Leases, dated Dec. 9, 2002)(ECF Doc. # 200.)  The purchase price was $1,015,000, subject to

adjustments, and included $200,000 in cash.  (Id. at ¶ 4.)  The Court signed the confirmation

order on December 26, 2002, and Best subsequently consummated the sale without bankruptcy

court approval.

If Best (and Chaite) had filed a different plan that paid less than 100%, and any creditor

objected, the Court would have had to value these assets in order to determine whether the plan

met the "best interests of creditors" test.  See 11 U.S.C. § 1129(a)(7).  The "best interests" test

gives every dissenting creditor a veto if the plan pays him less than he would receive in a

hypothetical chapter 7 case.  This is the minimum that a plan proponent can force a creditor to

accept.  The "best interests" test, therefore, prevents a solvent debtor from paying its creditors

less than 100% in the absence of their consent.  Factoring in the sale proceeds, the evidence

indicated that Best was solvent, even if MetTel's lost profit claim was $240,000 rather than

---

[21]     At the confirmation hearing, Larry Glick, Esq., Chaite's lawyer, stated that the sale would not affect the
distribution under the Plan.  (Transcript of Confirmation Hearing, held Dec. 3, 2002, at 4.)

$84,000. Similarly, if the unsecured creditor class voted to reject the hypothetical plan, as seems likely,[22] and Chaite retained his equity, as the confirmed Plan did, the hypothetical plan would have violated the absolute priority rule and failed the "fair and equitable" test. See 11 U.S.C. § 1129(b)(2)(b)(ii). In short, Best was still solvent even if MetTel held a $240,000 lost profits claim, and Best could not have confirmed any plan other than a 100% plan absent unanimous creditor consent.

### 4.        Usage Charges

MetTel's lost revenue computations primarily consisted of two types of charges, access and usage. Access charges refer to dial tone service. The charges are based on the number of payphones serviced, without regard to the number or length of the calls made using payphones. Access charges are essentially fixed costs, and the FCC line charge, discussed above, is an example of an access charge. Usage charges vary with the number and length of the calls.

The Natelco Agreement required Natelco to provide local and regional telecommunications services to the 964 payphones identified on Schedule A. Payphones could not be removed from Schedule A absent mutual consent. (MX 11, ¶ 1(iii).) Under ¶ 4(b)(i), Natelco agreed that the charges for the recurring features (i.e., access) and the "usage portion" would be keyed to the Verizon 900 tariff, and reduced by 25%, implying that it was obligated to provide both services. Best concedes that it was obligated to pay the access charges. (See Best's Proposed Findings & Conclusions, at ¶ 41.) It argues, however, that while it had the option to use MetTel's lines, it did not have the legal obligation to do so. (See id.) It claims that it could

---

[22]        Based on the proffer at the confirmation hearing, MetTel held more than one-third of the unsecured debt. If it came to a vote, and the Court used the debtor's $245,000 number to estimate MetTel's claim for voting purposes, see FED. R. BANKR. P. 3018(a), MetTel would have held a blocking vote in the unsecured class. See 11 U.S.C. § 1126(c).

have rerouted its calls through another carrier, and MetTel's damages should be limited to the lost profits on the access charges.

The primary objective when interpreting a contract is to give effect to the parties' intent as revealed in the language that they used. <u>Sayers v. Rochester Tel. Corp. Supplemental Mgm't Pension Plan</u>, 7 F.3d 1091, 1094 (2d Cir. 1993); <u>Seiden Assocs., Inc. v. ANC Holdings, Inc.</u>, 959 F.2d 425, 428 (2d Cir. 1992). Whether a contract is ambiguous presents a question of law that the court must decide in light of the entire agreement. <u>Sayers</u>, 7 F.3d at 1094-95. An agreement is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who examines the entire contract and knows the customs, practices, usages and terminology generally understood in the particular trade or business. <u>Nowak v. Ironworkers Local 6 Pension Fund</u>, 81 F.3d 1182, 1192 (2d Cir. 1996); <u>Sayers</u>, 7 F.3d at 1095; <u>Seiden Assocs.</u>, 959 F.2d at 428; <u>Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.</u>, 818 F.2d 260, 263 (2d Cir. 1987). Parol evidence is not admissible to create an ambiguity. <u>Readco, Inc. v. Marine Midland Bank</u>, 81 F.3d 295, 299 (2d Cir. 1996).

Nothing in the Natelco Agreement suggests that it was intended to be an option agreement. Natelco committed itself to provide access and usage for the 964 payphones listed in Schedule A. The contract did not bifurcate these two services, or suggest that one was mandatory and the other was not. Best's interpretation effectively gave it the unilateral right to remove all 964 payphones from Schedule A, with respect to usage, in plain contradiction of the requirement of mutual consent. Best failed to identify any language in the Natelco Agreement that supports its interpretation.

If resort to parol evidence were necessary or permissible, it would confirm that the

Natelco Agreement required Best to use Natelco's platform.  First, Best's "option," for the most

part, was not technologically possible.  Chaite opined that he could have rerouted calls to another

carrier from a computer in his office.  (Tr. (12-13) at 58-59.)  If he did, Best would have to pay

the other carrier, but not Natelco.  (Id. at 75-77.)  Chaite never testified that he ever tried to do

this.

          Economou testified more credibly that Best could not have rerouted the local calls

through a different carrier.  Any local call placed on a Best payphone would have traveled over

Natelco's (and thereafter, MetTel's) UNE-P to a switch at Verizon that was bought by Natelco.

Thus, a person could not make a local call on a Best payphone, without using Natelco's system.

(Tr. (12-4) at 125-26, 129.)  Economou conceded that a payphone company could use a different

carrier for regional calls.  (Id. at 126.)   Nevertheless, neither the Natelco Agreement nor Best's

interpretation distinguished between local and regional usage.  Furthermore, the inability to

reroute local calls undercut Best's interpretation that the Natelco Agreement, which included

local service, was limited to dial-tone service and did not require usage.

          Second, Chaite's testimony was a theory, not Best's custom or practice.  Best always

bought its access and usage from the same carrier, including Natelco.  (Tr. (12-13) at 123.)

Thus, Chaite's theoretical testimony did not match the way it did business.  This also belies the

notion that Best understood or intended that the Natelco Agreement allowed it to purchase access

and usage from different carriers at the same time.  Best's custom and practice may reflect that it

was not as easy to do as Chaite suggested, or was not feasible, as Economou stated (with respect

to local usage) or that it simply made no business sense to use two different carriers at the same

time.  The fact that the 1999 Contract required Best to use MetTel exclusively, and the Natelco

Agreement did not, does not alter this conclusion.  It may have made the parties' intent clearer,

but both agreements were subject to the same technological limitations and viewed against the same business practices.

## CONCLUSION

Best's objection to MetTel's lost profits claim is overruled, and the lost profits claim is fixed in the principal sum of $238,082.43. The Court has considered Best's other arguments, and concludes that they lack merit. MetTel is also entitled to interest at the annual statutory rate of 9%, see N.Y.C.P.L.R. 5004, calculated from the reasonably intermediate date of October 1, 2001 until the petition date. See N.Y.C.P.L.R. 5001(b). MetTel is not entitled to the 18% annual rate set forth in the Natelco Agreement. (MX 11, at ¶ 4(c).) That rate applied to unpaid invoices, (id.), and the lost profits claim is not based on unpaid invoices.

The foregoing constitutes the Court's findings of fact and conclusions of law under FED. R. CIV. P. 52(a), made applicable to this contested matter by FED. R. BANKR. P. 9014 and 7052. MetTel is directed to settle a money judgment on notice consistent with this opinion, but execution is stayed, pending further order of the Court and the disposition of Best's remaining set off claims. The parties are directed to contact chambers for the purpose of setting a status conference with a view toward scheduling further proceedings.

Dated: New York, New York
       May 8, 2007

                         /s/ *Stuart M. Bernstein*
                         STUART M. BERNSTEIN
                         Chief United States Bankruptcy Judge