```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:                                          :
                                                :     Chapter 11 (Confirmed)
          BEST PAYPHONES, INC.,                 :     Case no. 01-15472(SMB)
                                                :
                    Debtor.                     :
------------------------------------------------------X
```

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW
## REGARDING DISCOUNT OFFER

**A P P E A R A N C E S:**

DUANE MORRIS LLP
Attorneys for Manhattan Telecommunications
  Corporation d/b/a MetTel
380 Lexington Avenue
New York, New York 10168

      Fran M. Jacobs, Esq.
           Of Counsel

MAYNE MILLER, ESQ.
Attorney for Debtor
P.O. Box 8050 G.P.O.
New York, New York 10116

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

        Manhattan Telecommunications Corporation d/b/a MetTel ("MetTel") filed a multi-faceted proof of claim. The debtor, Best Payphones, Inc. ("Best"), objected to the claim, and also asserted several setoffs, including MetTel's failure to offer Best a payment discount that it had offered to other pay telephone operators. The Court conducted a bench trial on August 7, 2007, and now concludes that Best failed to sustain its burden of proof.

**BACKGROUND[1]**

The facts surrounding the disputes between MetTel and Best were found and determined during a prior trial relating to the liquidation of MetTel's claim for lost profits. (See Post-Trial Findings of Fact and Conclusions of Law, dated May 8, 2007 ("Lost Profits Op.")) (ECF Doc. # 650.) At all relevant times, MetTel operated as a competitive local exchange carrier that provided a variety of different types of telephone service. (Lost Profits Op. at 2.) Best was in the business of installing and operating payphones in Manhattan, the Bronx, and Brooklyn, and Michael Chaite was (and is) Best's president and sole shareholder. (Id.; Tr. at 10.) Pursuant to an order of the bankruptcy court made on the record on April 25, 2001, MetTel acquired payphone customer contracts and accounts receivable owned by the North American Telecommunications Corporation ("Natelco"). (Lost Profits Op. at 4-5.) Best had been a customer of Natelco, and MetTel acquired its contract (the "Natelco Agreement") and the outstanding debt Best owed to Natelco as part of the transaction. (Id. at 4.)

**A.    The Discount Plan**

Following the acquisition, MetTel developed a discount plan (the "Plan") designed to induce Natelco's former customers to pay the outstanding balances of their unpaid bills. (BX S at ¶ 2.) Orest Siryj, MetTel's Director of Risk Management, implemented and oversaw the Plan, which offered a series of options. To the extent relevant, a customer who signed a new contract with MetTel was eligible to receive up to a 25% discount. If the customer declined to sign a new contract, it was eligible to receive up to a 20% discount. The customer could pay the outstanding

---

[1] In this opinion, "Tr." refers to The Corrected Transcript Digitally Recorded Proceedings, certified Oct. 16, 2007 (ECF Doc. # 723), "MX" refers to MetTel's trial exhibits and "BX" refers to Best's trial exhibits. Finally, "Chaite Dep." refers to the deposition testimony of Michael Chaite, held on several days beginning with June 13, 2006. Designated portions of the deposition transcript were received in evidence at the end of the trial. Best was given an adjournment to cross-designate other parts of the deposition pursuant to FED. R. EVID. 106, but did not do so.

receivable in one, two or three installments, corresponding, respectively, to Option 1, Option 2 and Option 3. The discount decreased, however, as the installments increased. For example, if a customer declined to sign a new contract, and selected Option 3, it would only receive a 10% discount. (See BX S at Ex. A.)

To implement the Plan, Siryj prepared a worksheet showing the account receivable and the amount of the discount the customer would receive depending on which option the customer chose. (BX S at ¶ 2; Tr. at 73.) He then asked Kathy Beattie, a MetTel employee who had previously worked for Natelco, to call the former Natelco payphone customer, explain the options and offer the discount reflected on the worksheets. (Tr. at 71, 74, 85; BX S at ¶ 4.) If the customer accepted one of the discount options, Beattie would send the customer a confirmation letter and the worksheet. (Tr. at 74.) If the customer elected the "no contract" option, Beattie would advise Siryj when the customer had paid the remaining balance (between 80% and 90%, depending on the Option), and the customer would then receive the credit. (See Tr. at 85-86.)

**B.    The Offer to MetTel**

At the time of the Natelco acquisition, Best owed Natelco $41,703.01 under the Natelco Agreement and $33,127.35 under an earlier agreement with Natelco. (Tr. at 99; BX S at Ex. A.) Chaite received a telephone call from Beattie "sometime in May." (Tr. at 20, 64.) During a brief conversation, she explained the various options and discounts as outlined above. (Tr. at 19, 39, 49; Chaite Dep. at 562.) Chaite, however, had other issues. Chaite told Beattie that Best had paid Natelco a $45,000 deposit, and had prepaid $17,000, a monthly requirement, for certain recurring services. (Tr. at 19-20.) His trial testimony indicated that he wanted to credit the prepayment and contract deposit against the outstanding balance. (See Tr. at 57-59.) According

-3-

to Chaite, Beattie told him he would have to look to Natelco for the deposit and the prepayment. (Tr. at 21.)

Chaite declined to accept the offer during the telephone conversation, and insisted on something in writing:

> So I basically told her that I would like her to put all of this in writing, what we are speaking to about over the phone -- the discount, the deposit, and the monthly service charge that I paid in advance, and to put it in writing and I will discuss it with her after it is in writing.

(Tr. at 21.) Chaite testified that she agreed, but he never received a written discount offer. (Tr. at 50.)

Although Chaite could not pinpoint the date of his conversation with Beattie, it is possible to narrow it down. Bankruptcy Judge Bohanon approved the Natelco sale from the bench on April 25, 2001. (Lost Profits Op. at 4.) At that time, Best owed Natelco $41,703.01 under the Natelco Agreement on account of the unpaid March 1, 2001 bill. In early May, MetTel sent out the April 1, 2001 invoices (id. at 28), billing Best an additional $40,419.92 for that month. (BX O; Lost Profits Op. at 8.) On May 8, 2001, MetTel sent Best a disconnect notice, demanding payment of the March and April bills as well as an unrelated judgment. (BX P.) Exactly one week later, Best signed an agreement with BridgeCom, which replaced MetTel as Best's service provider. (BX Q.)

The Siryj worksheet and Beattie discussions did not include the debt due under the April 1st bill. Consequently, Beattie's call to Chaite had to have occurred during the first week in May, prior to the transmission of the April 1st bill, and certainly before the May 8th disconnect notice. Best was still a MetTel customer at the time under the existing Natelco Agreement. This fact becomes important later on.

-4-

**DISCUSSION**

Best contends that MetTel discriminated against Best in violation of N.Y. PUB. SERV. LAW. § 91(3) because it offered all former Natelco customers other than Best a 20% discount off of their outstanding bills. (Proposed Post-trial Conclusions of Law, dated Aug. 28, 2007 at 2) (ECF Doc. # 694.). Section 91(3) states:

> No telegraph corporation or telephone corporation shall make or give any undue or unreasonable preference or advantage to any person, corporation or locality, or subject any particular person, corporation or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

Initially, I question whether this statute even applies to the present situation. The few cases cited by the parties do not answer the question. This aspect of Best's setoff claim does not allege that Natelco provided discriminatory service or charged discriminatory rates. Rather, it deals with a situation in which MetTel offered inducements to collect unpaid accounts receivable. Under Best's theory, neither MetTel nor any other carrier could ever work out an unpaid bill with a given customer unless it offered the same terms to every other customer, regardless of the nature of any disputes and the customer's ability to pay.

In any event, Best failed to prove that MetTel gave anyone else an "undue or unreasonable preference or advantage" or subjected Best to an "undue or unreasonable prejudice or disadvantage" in connection with the Plan. Siryj used the same discount formula for all Natelco payphone customers with accounts receivable, including Best. (BX S at ¶ 3; Tr. at 92-93.) Chaite received the same telephonic offer that every other Natelco customer received. Best declined to accept the oral offer, and insisted on a written offer. There is no evidence that MetTel made a written discount offer to any of the Natelco payphone customers it acquired.

Chaite testified that Beattie promised to put the offer in writing, but his testimony was not credible. According to Chaite, he told Beattie that he was "interested in the discount," but insisted on a written offer because he did not consider the oral offer to be valid. (See Tr. at 49-51.) In fact, the offer could have saved Best a substantial amount. Prior to the April bill, Best owed MetTel $74,830.36. (See BX S at Ex. A.) Chaite thought Best was entitled to a $62,000 credit, which exceeded 80% of the account receivable ($59,864.29). If Chaite were interested in receiving a written offer that never materialized, he would have been expected to follow up with Beattie. Yet he never did. The evidence implies that Chaite insisted on the $62,000 credit, Beattie refused, and the matter ended there.

Chaite's shifting and inconsistent factual theories also undercut his credibility. MetTel sued Best prepetition to recover the unpaid Natelco receivable.[2] Best's answer to the complaint asserted the affirmative defense that MetTel gave a 20% discount "automatically" to all Natelco customers other than Best. (MX 4 at Ex. E ¶ 37.) Chaite no longer contends that MetTel "automatically" gave other Natelco customers a 20% discount, and at trial, denied that he ever took that position. (See Tr. at 39-40.)

Next, after MetTel filed a proof of claim in this proceeding, Best served an objection asserting, inter alia, that "at the time that [MetTel] acquired the customer accounts of NATelCo, MetTel offered former NATelCo subscribers (other than the Debtor) a 20% discount off any then outstanding balances in consideration of the subscriber's entry into an agreement for the payment of such outstanding balances," and therefore discriminated against Best. (MX 4 at ¶ 22-23)

---

[2] The lawsuit was automatically stayed when Best filed its bankruptcy petition on October 23, 2001.

-6-

(emphasis added.)  At trial, however, Chaite conceded that MetTel offered a 20% discount to Best if Best agreed to pay the outstanding balances.  (Tr. at 49.)

Best nevertheless pressed a theory at trial that it had first floated in an amended objection. Chaite contended that other customers received written offers, but Best did not.  (Tr. at 53; MX 5 at ¶ 27.)  Best based this theory on a "form" letter, (see BX H), that Chaite obtained from another customer.  (Tr. at 53, 55-56.)  The letter, however, is a confirmation of acceptance, not an offer. It refers to Beattie's prior conversation with the customer, and the second sentence states: "You have chosen the best possible discount by opting to pay the full balance," and signing a new provider contract.  The reverse side of the letter sets forth the calculated 25% savings, although much of the information has been blacked out.  The letter plainly shows that it was sent after the customer had accepted MetTel's offer.

Best is now left with only one argument: MetTel discriminated against Best because Beattie promised to send a written offer, but then failed to do so.  (See Proposed Post-trial Findings of Fact, dated Aug. 28, 2007 at ¶¶ 8-9) (ECF Doc. # 693.)  Even if I credited Chaite's testimony that Beattie promised to confirm the offer in writing, her failure to do so was not discriminatory.  MetTel did not send anything in writing to any other customer until the customer had already accepted one of the three options that MetTel offered.  (Tr. at 74, 94, 96; BX H.) Best failed to show that MetTel sent written offers on request to other former Natelco customers but not to Best.  The anti-discrimination laws cited by Best did not require MetTel to make a written offer to Best but an oral offer to everyone else, and Best has failed to identify any other basis in law that required MetTel to send a written offer.

Best also failed to show that it had otherwise complied – or was even prepared to comply -- with the requirements under the Plan. Chaite testified that he did not expect to receive a discount without making a payment, but admitted that Best never agreed to pay any part of the outstanding balances due to MetTel. (Tr. at 43, 45, 56-57.) In addition, the demand to apply the deposit and prepayment to the unpaid balance was nonsensical at the time. Best was still a customer of MetTel when Beattie made the offer. MetTel would have no reason to surrender the security of the contract deposit or the prepayment of a portion of the next month's bill so that Best could obtain a 20% discount. Furthermore, Best failed to show that MetTel allowed other customers to setoff deposits or prepayments against their outstanding bills.

By the time that Best had left MetTel, and might have become entitled to recover deposits or prepayments, the debt had grown substantially. The April 1st bill increased Best's outstanding balance by $40,419.92, and its total debt to $115,250.28. According to Best's proposed findings of fact, at ¶ 13, MetTel's May 1, 2001 invoice added another $33,362 in debt. Thus, Best owed $148,612.28. In fact, Best seeks 20% of this sum as its setoff. But Best would have been required to tender 80%, or $118,889.82, to receive the 20% discount. Even if MetTel had credited the full $62,000, Best would have had to pay an additional $56,889.82. Best never did, and once it filed its bankruptcy petition on October 23, 2001, it could not tender any part of this prepetition debt.

In conclusion, MetTel made the same discount offer to Best that it made to the other former Natelco customers. Chaite declined to entertain much less accept the offer. Best failed to prove that it was the victim of undue or unreasonable prejudice or disadvantage, or that MetTel provided the other former Natelco customers with an undue or unreasonable preference or advantage. Accordingly, its discrimination claim based upon MetTel's failure to offer the Plan is

-8-

dismissed. The Court has considered Best's remaining arguments, and concludes that they lack merit. In light of the disposition, it is unnecessary to consider MetTel's alternative argument that Best failed to prove that it was damaged by MetTel's alleged discrimination.

The foregoing constitutes the Court's findings of fact and conclusions of law. Settle order on notice.

Dated: New York, New York
　　　　October 25, 2007

　　　　　　　　　　　　　　　　　　/s/ *Stuart M. Bernstein*
　　　　　　　　　　　　　　　　　　STUART M. BERNSTEIN
　　　　　　　　　　　　　　　　Chief United States Bankruptcy Judge